NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0742n.06

No. 14-3516

**FILED**

Nov 09, 2015

DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| BOBBY CUTTS, JR., | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| KEITH SMITH, | ) | COURT FOR THE |
| | ) | NORTHERN DISTRICT OF |
| Respondent-Appellee. | ) | OHIO |
| | ) | |
| | ) | |

BEFORE:     COLE, Chief Judge; GIBBONS and STRANCH, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge.  Bobby Lee Cutts, Jr.—an Ohio state prisoner convicted of two counts of aggravated murder and various other crimes—challenges the district court's denial of his petition for a writ of habeas corpus.  He claims that the Ohio Court of Appeals's rejection of his claim of implied juror bias constituted a decision contrary to, or involving an unreasonable application of, clearly established federal law.  Specifically, he argues that he is entitled to relief because the trial court should not have allowed a juror to serve after the juror had participated in a search for the murder victim's body.  We believe the doctrine of implied juror bias is not clearly established.  Even if it were, the circumstances of Cutts's case would be insufficient to trigger the doctrine.  We therefore affirm the district court's denial of habeas relief.

I.

Police began searching for Jessie Davis when her mother, Patricia Porter, reported Davis missing. Porter had been unable to reach Davis and eventually went to her home, where she found nobody home except Davis's two-year-old son. Several members of the community assisted in the search.[1]

Cutts—the father of Davis's son—initially purported to help. But eight days after Davis was first reported missing, Cutts led officers to the bottom of an embankment in a park, where they found Jessie's body. He was arrested and eventually indicted by an Ohio grand jury for the aggravated murders of Jessie Davis and Davis's unborn daughter. The indictment also charged Cutts with two counts of abuse of a corpse, one count of aggravated burglary, and one count of endangering a child.

The trial court granted Cutts's motion to implement certain procedures to insulate prospective jurors from pre-trial publicity. The court also added some of Cutts's proposed questions to the juror questionnaire. In their answers to that questionnaire, three venire members indicated that they had assisted in the search for Davis. The trial judge denied Cutts's motion to remove the three prospective jurors for cause. Cutts eventually exhausted his peremptory challenges and one of the three was seated on the jury. After the jurors were selected, the trial court denied Cutts's motion for a change of venue based on alleged juror bias.

The jury acquitted Cutts of the aggravated murder of Davis but found him guilty of the lesser included offense of murder. Cutts was also convicted of all the remaining offenses, including the aggravated murder of Davis's unborn child. Following a capital sentencing phase,

---

[1] This court "accept[s] the state court's determination of a factual issue unless the petitioner upsets the presumption by clear and convincing evidence." *Jackson v. Bradshaw*, 681 F.3d 753, 759 (6th Cir. 2012). The material facts presented here are undisputed.

the jury did not recommend a death sentence. The court imposed an aggregate sentence of fifty-seven years to life in prison.

The Ohio Court of Appeals affirmed Cutts's conviction and sentence. *State v. Cutts*, No. 2008CA000079, 2009 WL 2170687, at *34 (Ohio Ct. App. July 22, 2009). The Ohio Supreme Court declined to hear his appeal. *State v. Cutts*, 917 N.E.2d 812 (Ohio 2009) (Table). The United States Supreme Court denied *certiorari*. *Cutts v. Ohio*, 560 U.S. 904 (2010) (mem.). Cutts then filed for a writ of habeas corpus in the Northern District of Ohio, asserting ten grounds for relief. The matter was assigned to a magistrate judge, whose report and recommendation recommended denial of the petition. The district court adopted the report and recommendation in its entirety and denied relief.

The district court issued a certificate of appealability on a single ground: Cutts's claim that the district court improperly impaneled the juror who had participated in the search for Davis. This timely appeal addresses that issue.

II.

The Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) provides that a federal court may not grant a writ of habeas corpus after a state court has adjudicated the case on the merits unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The relevant state court decision is "the last state-court decision on the merits." *Garcia v. Andrews*, 488 F.3d 370, 374 (6th Cir. 2007). Here, that is the Ohio Court of Appeals's decision from 2009.

"[T]he phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' . . . . refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (quoting 28 U.S.C. § 2254(d)(1)). A decision is "contrary to" clearly established law if "the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if "the state court confronts a set of facts that are materially indistinguishable" from a Supreme Court decision and nevertheless arrives at a different result. *Id.* at 405–06. An "unreasonable application" of clearly established federal law occurs "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

Habeas relief may be granted only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). "Put another way, 'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Abby v. Howe*, 742 F.3d 221, 226 (6th Cir. 2014) (quoting *Harrington*, 131 S. Ct. at 786–87).

In reviewing the denial of a habeas petition, we review the district court's legal conclusions *de novo* and its factual findings for clear error. *Jackson v. Bradshaw*, 681 F.3d 753, 759 (6th Cir. 2012).

III.

Cutts argues that the Ohio Court of Appeals's decision to affirm his convictions despite the presence of a juror who had searched for Davis was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. Cutts does not argue that the juror exhibited actual bias. In other words, he does not claim that this juror was *in fact* biased toward the prosecution, nor does Cutts point to any evidence in the record that would suggest as much. Rather, he contends that the simple fact that the juror participated in the search "evidences the strong likelihood of an improper emotional attachment to the victim" and should have resulted in the juror's automatic dismissal. This amounts to a claim of implied bias: "a conclusive presumption that a juror is biased," *see United States v. Frost*, 125 F.3d 346, 379 (6th Cir. 1997), based exclusively on "the relationship between a prospective juror and some aspect of the litigation," *see Johnson v. Luoma*, 425 F.3d 318, 326 (6th Cir. 2005). We must therefore consider whether the state court's treatment of the claimed implied bias ran contrary to, or unreasonably applied, clearly established federal law as determined by the Supreme Court.

This court has previously held that the implied bias doctrine is not clearly established for AEDPA purposes. In *Johnson v. Luoma*, the court's rejection of a petitioner's implied bias claim on habeas review turned in part on the fact that "the continued vitality of the doctrine" was in doubt. 425 F.3d at 326 (citing *Conner v. Polk*, 407 F.3d 198, 206 n.4 (4th Cir. 2005)); *United States v. Herndon*, No. 99-5642, 2000 WL 1290378, at *4 (6th Cir. Sept. 6, 2000)). Relying on *Johnson*, this court again held in *Treesh v. Bagley* that "doubt over the continued viability of the doctrine of implied bias" was one reason to deny the habeas claim. 612 F.3d 424, 437 (6th Cir. 2010).

These cases bind us. While the § 2254 inquiry looks to the clearly established law announced by the Supreme Court, our court's published holdings identifying the content of clearly established Supreme Court law for § 2254 purposes are binding on future panels. *See Renico v. Lett*, 559 U.S. 766, 778–79 (2010); *Coles v. Smith*, 577 F. App'x 502, 507–08 (6th Cir. 2014) (discussing the impact of *Renico*); *Smith v. Stegall*, 385 F.3d 993, 998 (6th Cir. 2004) (discussing the ways in which Sixth Circuit panels may bind later panels in habeas cases).

A brief review of the relevant Supreme Court jurisprudence will be helpful to understand the ambit of our decisions in *Johnson* and *Treesh* and will also underscore the key point we made in those cases: the implied bias doctrine is not clearly established. We need not consider the more difficult question of whether the doctrine still exists at all. That question would confront us if we were reviewing a case like this on direct appeal. But the lack of clearly established law compelled the denial of habeas relief in *Johnson* and *Treesh*, and it compels the same outcome here.

In *Dennis v. United States*, 339 U.S. 162 (1950) the Supreme Court held that the petitioner—the General Secretary of the Communist Party of the United States tried for failing to comply with a subpoena requiring appearance before the House Committee on Un-American Activities—was not entitled to the automatic removal of any juror who happened to be a government employee. Preservation of the opportunity to show actual bias adequately protected the defendant's Sixth Amendment right to an impartial jury. *See id.* at 171–72. The Court refused to imply bias, even in light of the petitioner's claim that a government employee would be likely to side with the government to preserve the appearance of loyalty when determining the guilt of an individual deemed subversive to the government. *Id.* at 171; *see also Frazier v. United States*, 335 U.S. 497, 511–13 (1948) (refusing to imply bias when the jury in a drug trial

was composed entirely of government employees); *United States v. Wood*, 299 U.S. 123, 133–34 (1936) (refusing to imply bias by government employees selected for a larceny trial in the District of Columbia).

The Supreme Court has implied bias, however, in subsequent cases involving extreme circumstances. In *Turner v. Louisiana*, 379 U.S. 466 (1965), for example, deputy sheriffs who were the two key witnesses against the defendant also drove the jury to dinner and spent time with them outside the courthouse. *Id.* at 468. The Court recognized that the relationship "could not but foster the jurors' confidence" in the deputies, and that the defendant's "fate depended upon how much confidence the jury placed in these two witnesses." *Id.* at 474. Bias was implied without the need for any further showing. *Id.*

In *Remmer v. United States*, 347 U.S. 227 (1954), where an outsider remarked to a juror that he could profit by finding in favor of the defendant, the Supreme Court held that private communications with jurors in criminal cases were "deemed presumptively prejudicial." *Id.* at 229. The Court made clear that "[t]he presumption is not conclusive, but the burden rests heavily upon the Government to establish . . . that such contact with the juror was harmless to the defendant." *Id.* After *Turner* and *Remmer*, then, it was clear that the Court would imply bias in some extreme situations.

In the leading habeas case of *Smith v. Phillips*, 455 U.S. 209 (1982), the Court introduced a level of uncertainty that has remained unresolved in more than three decades since. During the course of the trial in that case, a juror applied for a job in the district attorney's office that was prosecuting the case. *Id.* at 212–13. The Supreme Court held that habeas relief was unavailable because the petitioner received due process in a post-trial hearing and failed to show actual bias. *Id.* at 217–18. Justice William Rehnquist's majority opinion emphasized: "[D]ue process does

not require a new trial every time a juror has been placed in a potentially compromising situation." *Id.* at 217. Trial courts can seek to "prevent prejudicial occurrences." *Id.* Crucially, the majority continued, it is the task of the trial court to "determine the effect of such occurrences when they happen" by way of a hearing. *Id.* The majority opinion made no mention of the possibility of implied bias arising as a result of a juror's connection to the case or its participants.

In a separate concurrence, Justice Sandra Day O'Connor agreed that the defendant's postconviction hearing was adequate to preclude relief on the facts of the case. *Id.* at 221–24 (O'Connor, J., concurring). But she also stated:

> Because there may be circumstances in which a postconviction hearing will not be adequate to remedy a charge of juror bias, it is important for the Court to retain the doctrine of implied bias to preserve Sixth Amendment rights. I read the Court's opinion as not foreclosing the use of implied bias in appropriate situations
> . . . .

*Id.* at 224.

We need not consider further the issue of the continued viability of the implied bias doctrine. It has not been overruled, and perhaps the Supreme Court will consider the issue in the future. For our purposes, it is sufficient to reaffirm our holdings in *Johnson* and *Treesh* that the implied bias doctrine is not clearly established for the purposes of § 2254. We follow those cases and hold that Cutts is unable to show a violation or unreasonable application of clearly established law here.

IV.

Even if the implied bias doctrine constituted clearly established law, Cutts would not prevail. A successful habeas claim under that theory would still require a showing that the trial court's failure to imply bias in the specific circumstances of Cutts's trial constituted "an error well understood and comprehended . . . beyond any possibility for fairminded disagreement."

*Abby*, 742 F.3d at 226 (internal quotation marks omitted). Thus, Cutts would need to demonstrate that the juror's connection to the case or the parties was so extreme as to clearly require automatic removal of the juror without further inquiry. Cutts has not done so.

"In those circuits that recognize the principle of implied bias, resort to it has been limited 'to those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances.'" *Sanders v. Norris*, 529 F.3d 787, 792 (8th Cir. 2008) (quoting *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988)). Justice O'Connor provided some examples of sufficiently extreme circumstances: "a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." *Phillips*, 455 U.S. at 222 (O'Connor, J., concurring); see *Sanders*, 529 F.3d at 792 ("When determining whether bias should be presumed, courts often refer to Justice O'Connor's concurring opinion in *Phillips*."). None of these apply on their face to Cutts's case. And though we have authority under AEDPA to apply general principles beyond the precise scenarios in which the Supreme Court has used those principles, *see Pannetti v. Quarterman*, 551 U.S. 930, 953 (2007), we are not persuaded that any of Justice O'Connor's categories apply here by appropriate analogy or extrapolation.

There is no suggestion that the challenged juror in Cutts's case had a familial or employment relationship with any participant in the case. But Cutts claims that the juror's participation in the search demonstrates some emotional allegiance to the victim that gives rise to as great a possibility of bias as a juror who is "a witness or somehow involved in the criminal transaction." *See Phillips*, 455 U.S. at 222 (O'Connor, J., concurring). A person could, indeed,

join a search out of a personal connection to the victim. Conceivably, also, participating in the search could *engender*, not just reflect, some emotional attachment to the victim.

Nonetheless, this situation carries a far lower possibility of bias compared to a witness or a person involved in the crime. A person may have a variety of other motives for joining a search besides a personal connection, not least a sense of duty as a citizen and concern for a fellow human. And participation in the search would not necessarily create emotional attachment. Even if it did, it would not necessarily give rise to bias in favor of the prosecution and against the defendant. Compare this to a witness to the alleged crime, who would almost certainly struggle to impartially decide the case based on the evidence presented rather than her own recollection of the events. Partiality would be even more likely if the juror were involved in the criminal transaction. Such a person may have preexisting prejudices in addition to strong self-interested motives for preferring one version of the facts over another. We believe these would weigh much more strongly in the mind of an average juror than the participation in a fruitless search for the victim.

Even when a juror was actually present when the victim's body was found, our sister circuit—while recognizing that the doctrine may exist in principle—refused to imply bias. *Sanders*, 529 F.3d at 793. Cutts argues that a different connection existed in that case: the juror was the county coroner who had a professional connection to the victim, *see id.* at 790, while the average citizen's role in a search suggests an emotional connection. As already discussed, it is not necessarily true that an emotional connection would exist. Even if it did, it is not necessarily more likely to create bias than a professional connection. The coroner's presence in *Sanders*, coupled with his expertise, may have caused him to form his own opinions about the circumstances of the victim's death. This could not have happened in the present case because

nothing came of the search. A professional connection also existed in *Conner v. Polk*, 407 F.3d 198 (4th Cir. 2005), where the juror in a retrial had reported on the first trial in her role as a journalist. Again, we believe that this connection—and the pre-existing knowledge and views the juror likely had as a result—was more extreme than the connection in Cutts's case. And yet, the Fourth Circuit refused to imply bias in *Conner*. *Id.* at 206–07.

These cases further demonstrate that the facts of Cutts's case do not clearly give rise to an implication of bias. Although the juror was "placed in a potentially compromising situation," *see Phillips*, 455 U.S. at 217 (majority opinion)—and although the trial judge would have been more prudent to remove the juror for cause—this does not permit habeas relief. As a result, even if we were convinced that the implied bias doctrine were clearly established, fairminded jurists would not agree that the circumstances fall within one of the extreme categories in which the implication may arise. Clearly established law would still only entitle Cutts to the opportunity to prove *actual* bias, an opportunity the trial court afforded him.

V.

Finally, Cutts suggested at oral argument that the decision of the Ohio Court of Appeals involved "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *see* 28 U.S.C. § 2254(d)(2), because the juror outwardly demonstrated an attachment to the victim. This contention fails for several reasons. First, it was not raised in the briefs. "[I]n this circuit we routinely deem arguments waived when raised only verbally and not in the written briefs . . . ." *Lamson & Sessions Co. v. Peters*, 576 F. App'x 538, 543 (6th Cir. 2014). Second, for reasons already discussed, we believe the Ohio Court of Appeals was not unreasonable in the way that it viewed the juror's involvement in the search for the victim—it was not severe enough to clearly require reversal, even though "the better practice would have

been to excuse any such prospective juror for cause." *See State v. Cutts*, 2009 WL 2170687, at *33. Third, any additional fact-finding concerning the juror would seem to go to actual bias. Cutts is only challenging the state court's decision on implied bias. Finally, even if we were to consider actual bias, the record does not include *voir dire* transcripts or any other materials that would allow us to determine whether the challenged juror in fact harbored pro-prosecution bias that would have required removal for cause. Considering whether the facts were unreasonably determined requires "an independent review of the record." *Howard v. Bouchard*, 405 F.3d 459, 468 (6th Cir. 2005).

## VI.

For the above reasons, we affirm the district court's denial of habeas relief.